| 77 | 339 |
|-----|-----|
| 110 | 5 55 |

## Chicago Exhibition Co. v. Illinois State Board of Agriculture.

1. INSOLVENCY—*Sufficient Allegations of.*— Where a bill avers in positive terms, and as of the complainant's own knowledge, that the defendant's only property is its leasehold interest in a building, and that such interest is mortgaged for an amount greatly in excess of its value, it is a sufficient allegation of insolvency.

2. EQUITY PRACTICE—*Interlocutory Injunctions.*—An interlocutory

340     APPELLATE COURTS OF ILLINOIS.

VOL. 77.] Chicago Exhibition Co. v. Ill. State Bd. of Agriculture.

injunction is a mode by which a court preserves property in dispute, with the least injury to all parties, until it can finally determine the respective rights of the parties claiming it.

3. INTERLOCUTORY INJUNCTIONS—*Granting of*.—When the rights of the parties are doubtful, the court will, on an application for an interlocutory injunction, consider the comparative injury which will result from a granting or withholding of it, as well as the justice of the case, as it appears on the evidence.

4. SAME—*When Granted Without Notice*.—When the mere act of giving notice may be productive of the mischief apprehended by inducing the defendant to accelerate the act, in order that it may be completed before the time for making the application arrives, the court will award an injunction without notice.

5. SAME—*Verification of the Bill*.—An affidavit of the complainant in a chancery proceeding, which states that he has read the bill of complaint and knows the contents thereof, and that the matters and things therein stated are true of his own knowledge, except those allegations in said bill made upon information and belief, and as to all such matters he believes them to be true, is not sufficient.

**Bill for an Injunction.**—Appeal from the Circuit Court of Cook County; the Hon. EDMUND W. BURKE, Judge, presiding. Heard in this court at the March term, 1898. Order granting an injunction reversed. Opinion filed May 16, 1898.

NEWMAN, NORTHRUP & LEVINSON, attorneys for appellant.

SHOPE, MATHIS, BARRETT & ROGERS, attorneys for appellee.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

This is an appeal from an interlocutory order in chancery, granting a temporary injunction on a bill filed by appellee against appellant for a reformation of a contract, an accounting and a temporary injunction, as ancillary to the relief prayed. June 11, 1897, by written instrument of that date, the Chicago Exhibition Company leased to the State Board of Agriculture the right to occupy and use for twelve days, commencing November 2, 1897, and ending November 13, 1897, the ground floor and gallery spaces of the Coliseum, situated in the city of Chicago, for the holding of a fat stock, horse, agricultural, horticultural, floricultural, pet

and poultry show.   The lease contains the following provisions :

"That said lessor shall receive, in lieu of rent, thirty per cent (30 %) of the entire gross receipts from all sources of income to the parties hereto from said show, as herein outlined, to be held by said lessee, and the said lessee is to receive seventy per cent (70 %) of said receipts.

"During the time when the said Coliseum is occupied and used under the terms of this agreement, the lessor shall provide and furnish at its cost said Coliseum with light (except light for concessionaires' exhibits and booths and special displays), heat, an amphitheatre for seating about seven thousand people, and an arena about three hundred by one hundred feet (300' x 100') protected on the sides with a closed railing ; also janitor service (excepting stock attendants), and cause to be thoroughly swept and cleaned all parts of said Coliseum which shall be occupied and used under the terms of this agreement, excepting stalls and pens actually occupied by animals; also necessary water, ushers and ticket sellers, excepting ticket takers, same to be furnished and paid for by the lessee ; necessary police ; and also furnish and erect four hundred (400) stalls, which said four hundred stalls shall be the property of the lessor, and two hundred (200) more stalls, the latter to be erected with material to be furnished by the said lessee, which shall be the property of the lessee.

"The said lessee covenants and agrees to offer fifteen thousand dollars ($15,000) in premiums and expend not less than three thousand dollars ($3,000) in advertising, and to pay for all other incidental expenses not provided for above, which may be incurred in properly organizing and holding said show.

"Inasmuch as the lessor is under annual contract for certain concessions, the lessee agrees to confer with the lessor and obtain its approval before making contracts with concessionaires or renting floor space to same, and also agrees to permit the lessor to solicit concessionaires for floor space equal to one hundred by fifty feet (100' x 50'), provided the

342    APPELLATE COURTS OF ILLINOIS.

VOL. 77.] Chicago Exhibition Co. v. Ill. State Bd. of Agriculture.

lessor obtains the written approval of the lessee before closing contract with any concessionaire; it being understood that the proceeds from such concessionaires are to be considered part of the gross receipts above mentioned.

"A statement in writing showing the amount of the gross receipts from admissions of spectators and from other sources shall be prepared immediately after said show, and the owners of the land upon which said Coliseum is located shall have the right, if they so desire, to be represented at the counting and checking of said receipts, and the lessee or its duly authorized representative shall have the right to be present at the gates and at the counting and checking of such receipts. The lessor and lessee agree that they will keep a full and true account of all receipts of said show and that said account shall be open for inspection by the parties hereto and by the owners of the land, through their agents, at any time during business hours, and full payment of rental and receipts from concessions shall be made daily, if so requested by either party hereto."

It was further provided by the lease, that in the event that appellee should not hold the show, it would pay $500 per day for the number of days specified.

Another agreement was executed by and between the parties in September, 1897—on what day in September does not appear from the agreement, but is alleged by the bill to have been the 10th—which agreement is follows:

"Whereas, the Chicago Exhibition Company entered into a contract with the Illinois State Board of Agriculture, dated June 11, A. D. 1897; and

"Whereas, said contract provides that the said Chicago Exhibition Company shall provide certain seating capacity and erect certain stalls as specified in said contract; and

"Whereas, the said Illinois State Board of Agriculture has materially enlarged the plan and scope of the fat stock, horse show and agricultural and horticultural exhibition to be held in the Coliseum building under the terms of said contract; and

"Whereas, the said Illinois State Board of Agriculture

requires on account of said enlargement of the plan and scope of said exhibition a radical change and increase in said work to properly prepare for said exhibition.

" Now, therefore, it is agreed by and between the parties hereto as follows, to wit :

" That for and in consideration of the payment of the sum of thirty-eight hundred and fifty dollars ($3,850), to be deducted from that portion of the gross receipts of the said exhibition to which the said State Board of Agriculture shall be entitled under the original contract of June 11, 1897, the said Chicago Exhibition Company, in lieu of the work required under said original contract, hereby agrees to do all the work required and to furnish the material necessary for the arrangement of the Coliseum building in accordance with the plans marked A1 and A2, together with the specifications accompanying the same, the said plans and specifications being made a part of this supplemental agreement, with the following modifications : iron shoes to be omitted; the new boxes to have brass rails in front and wooden rails for the remainder; lumber to be white pine or Norway pine instead of yellow pine; old lumber to be used where practicable; the face of box stalls only to have wire guards, and only divisions of partitions of single stalls for horses to have wire guards; undressed lumber to be used for stalls except for faces of box stalls and for all the posts of stalls; posts to be of pine instead of oak; and the lessor to own all material of every kind after the close of the exhibition.

" It is hereby further agreed by and between the parties hereto that the time for holding said exhibition is hereby shortened to one week instead of twelve days, and the lessor hereby relieves the lessee from the payment of the five hundred dollars ($500) for each day over the one week as called for in the sixth paragraph of the eighth section of the original contract.

" This agreement shall bind the parties hereto, their successors and assigns," etc.

The specifications above referred to contain the following :

344 APPELLATE COURTS OF ILLINOIS.

VOL. 77.] Chicago Exhibition Co. v. Ill. State Bd. of Agriculture.

"The contractor undertaking the work is to furnish all material necessary and labor required for the erection of 450 single stalls and 175 box stalls. The State Board of Agriculture will furnish the material for all the stalls, excepting for 400 of those first mentioned. The 450 stalls to be constructed in accordance with the details on the plan shown as 'Plan A2,' and arrangement of the stalls and the building to be as shown on 'Plan A1.' The entire space upon which stalls are located, being about 300 x 300 feet, to be covered with two inch plank, and upon this plank floor stalls and other work are to be erected."

After specifying material to be used, measurements, and such details as are usual in specifications for construction, the specifications conclude as follows:

"It is distinctly understood and agreed by and between the parties hereto that the thirty per cent of the gross receipts to which the lessor is entitled under the terms of the original contract of June 11, 1897, shall exclude any share in the receipts for advertisements, State appropriation, guaranty fund, or donations made to the lessee ror holding the said horse, fat stock, dairy, poultry and agricultural show in the Coliseum building, November, 1897."

Both contract and specifications purport to be signed by the parties.

The bill, referring to the agreement of September, 1897, alleges as follows:

"Your orator, further complaining, respectfully shows unto your honor, that at the time of the making of said supplemental agreement both the officers and members of your orator's said board, and the officers and directors of the said Chicago Exhibition Company well knew the capacity of the said Coliseum building, and the stalls and other structures that could and might be built and placed therein, outside of the space occupied by the arena and seats for exhibition in the ring, or arena, and outside of the various entry ways, etc., reserved in the said original contract, and that each thereof well knew and understood that with the plans of the enlarged exhibition to be given by your orator the

whole of such space might be required to be filled with
stalls, pens and appurtenances for the proper housing, car-
ing for and exhibition of the horses, cattle, sheep, poultry,
and agricultural, horticultural and floricultural exhibits that
were likely to be present and exhibited at said show and
exhibition; and that each of said parties and the respective
officers and members of the board of your orator executed
said supplemental contract in view of such conditions, and
in contemplation of the increased and extended character
of the show and exhibition, and well understood that the
whole of the space not occupied by the auditorium and
arena, and said reservations, might be required to be built
up and filled with such stalls, pens and appurtenances as
might be necessary to make said exhibition complete and to
accommodate exhibitors at said show. And that it was, at
the time of the making of said supplemental agreement,
expressly agreed and understood by your orator's said offi-
cers and members of its board, and by the said Chicago
Exhibition Company, its officers and directors, that the said
supplemental agreement was intended to take the place of
so much of said original agreement of June 11, 1897, as pro-
vided the manner of dividing said extra space, and of the
number and character of the stalls and appurtenances therein
built and made, and to take the place of so much of said
original contract as required your orator to furnish lumber
for any or either of the stalls or appurtenances to be therein
built. *And it was expressly agreed and understood by the
parties, and it was so intended to be expressed in said con-
tract, that the said Chicago Exhibition Company was to
furnish all the material and do all the work necessary to
provide all of such stalls, pens and appurtenances and places
of exhibition within said Coliseum building as might be
required to fully and perfectly accommodate the said exhi-
bition and exhibitors, as might be required, and thereafter
directed to be made and placed therein* by the officers and
agents of your orator. And it was further also expressly
understood that the reference in said supplemental contract
to the said Plans A1 and A2, and the specifications accom-

346    APPELLATE COURTS OF ILLINOIS.

VOL. 77.]  Chicago Exhibition Co. v. Ill. State Bd. of Agriculture.

panying the same referred only to the manner of making
what is known in the original contract as the arena, box
seats and the promenades and seatings; and in respect of
stalls and other appurtenances for caring for the stock that
might be entered for exhibition, such reference was only
intended and understood by the parties to refer to so much
of said plans and specifications as stated in what manner
the work was to be done, and did not, and was not so
understood by the parties, refer to the number of stalls
and pens or the character of appurtenances to be built in
said Coliseum building, or to the arrangement thereof in
said building, as shown upon said plans, but on the con-
trary, it *was expressly agreed and understood that the said
Chicago Exposition Company was to build all such stalls, pens
and appurtenances for the keeping and exhibition of horses,
cattle, sheep, hogs, poultry and horticultural, agricultural and
floricultural exhibits as might be entered at or be attendant
upon said exhibition, so as to be held by your orator in said
building, and to furnish all material therefor, in considera-
tion of the said sum so agreed to be paid out of the seventy
per cent of the gross income from said show coming to your
orator.*"

It will be observed from the italicized parts of the fore-
going quotation from the bill, that it is alleged in positive
terms that it was understood and agreed by the parties as
therein stated; in other words, that the actual contract be-
tween the parties was as therein stated. The bill then
alleges that it was the intention of the parties that by the
supplemental agreement the first clause of the specifications
above quoted, commencing with the words, " The contractor
undertaking this work," and ending with the words, " are
to be erected," should be abrogated, and that, by mistake
and inadvertence, that clause was not excepted from the
contract. The bill then proceeds as follows: " Your orator
avers the fact to be that the contract between your orator
and the said Exhibition Company was, as aforesaid, that the
number of stalls and their location and their kind, whether
single or double, and the nature and character of the pens

and other appliances and appurtenances to be put in said building, to be used by your orator and the exhibitors of said show, during the continuance thereof, was to be of such number, occupy such space and be of such kind as your orator, by its agents and officers, might thereafter direct, and to be built when ordered by your orator or its said officers or agents, according to such portion of said specifications as related to the details of construction of the stalls, pens and appurtenances."

We are of opinion that the allegations of the bill to the effect that the actual contract between the parties was materially different from what it purports to have been by the writing of September, 1897, and the specifications therein referred to are sufficient, if clearly and satisfactorily proved, to entitle the complainant to a reformation of the written agreement in accordance with the actual agreement between the parties. That a court of equity has jurisdiction to reform such a contract is not controverted.

In a subsequent part of the bill, and following the allegations above referred to, it is alleged that complainant was the owner, prior to the execution of the agreement of June 11, 1897, of about 200 or 225 knocked down stalls, the material of which was referred to in that contract as the material to be furnished by complainant for the erection of 200 stalls, and that, at the time of making the supplemental agreement, it was agreed between the parties that the Exhibition Company might use that material, so far as the same could be used, in building stalls and fitting up the space outside the arena and auditorium and reserved spaces with stalls; but that after the supplemental agreement was made and before the said material came to the possession of the Exhibition Company, it was destroyed by fire, and afterward complainant instructed the Exhibition Company to supply the lumber and offered to pay for the same, which complainant alleges it was not bound to do. Appellant's counsel contend that this agreement in reference to the old material is inconsistent with appellee's claim that appellant, by its contract, was bound to furnish all the material for

348    APPELLATE COURTS OF ILLINOIS.

VOL. 77.] Chicago Exhibition Co. v. Ill. State Bd. of Agriculture.

the stalls. We do not think it necessarily inconsistent with such claim that appellee, for whose use all the stalls were to be erected, should agree to permit appellant to use, in the erection of stalls, old material which had theretofore been used for stalls; or that when such material was burned appellee should agree that a like quantity of lumber should be substituted for it, at appellee's expense, on the understanding alleged by appellee, that the lumber, after being so used, should belong to it. Whatever effect these circumstances may have, in connection with other evidence, on the final hearing, we do not think them sufficient to overturn the *prima facie* case for a reformation of the contract stated in the bill.

The bill avers, as of complainant's own knowledge, that the tickets to the show, including 111 box tickets, were delivered to the appellant for sale, and were sold and disposed of by appellant in large quantities and for a large amount; that appellant has reported to appellee that it, appellant, had collected from the sale of tickets the sum of $47,091.25; and that appellant, itself, took two of the boxes at the season rental of $100 each, and has reported to appellee that it is chargeable for said boxes; and that appellant placed the box tickets which were delivered to it for sale in the hands of John A. Logan, Jr., for sale and disposition.

It is averred, on information and belief, that John A. Logan, Jr., has reported to appellant that there was realized from the sale of boxes and box seats $9,670, and that appellant has received of that amount $5,800. It is admitted by the bill that appellee is chargeable with about $21,075. Other items are mentioned in the bill which we do not deem necessary to state here. The bill shows that there has been no final accounting between the parties, and avers that the appellant has in its hands moneys derived from the gross income of the show, which, appellee avers on information and belief, is in excess of $12,000, and avers that said moneys are deposited in the Continental National Bank and are subject to appellant's control, and that appellant received

said moneys as trustee for appellee to the extent of seventy per cent thereof.

The bill further alleges, as of complainant's own knowledge, that appellant has no property other than the leasehold of the Coliseum building, its fixtures and appurtenances, and that it, appellant, has issued bonds secured by mortgage on its said leasehold interest to an amount greatly in excess of the value thereof, and avers, on information and belief, that appellant is insolvent and in such financial circumstances that a suit at law by appellee against it would be unavailing. The bill prays for a reformation of the contract, for an accounting, that out of the moneys deposited in the Continental National Bank as aforesaid, the amount found to be due to appellee may be paid, and a writ of injunction issue, restraining appellant, its agents, etc., from withdrawing from the bank the moneys deposited, as aforesaid, etc., and for general relief. The court ordered an injunction as prayed, and the writ issued accordingly. Appellant's counsel contend that there is not a sufficient averment of the insolvency of appellant. The bill avers, in positive terms, and as of the complainant's own knowledge, that appellant's only property is its leasehold interest in the Coliseum building, and that said leasehold interest is mortgaged for an amount greatly in excess of its value. We think this a sufficient allegation of insolvency. It would be sufficient in a bill filed by a mortgagee for a strict foreclosure of the mortgage. Wilson v. Geisler, 19 Ill. 49; Stephens v. Bichnell, 27 Ib. 444.

We are of opinion that, in view of the allegation that appellant is insolvent, taken in connection with other allegations in the bill, there was probable ground for the court to believe that, unless enjoined without notice, appellant would withdraw the moneys from the bank to the injury of appellee, and this was sufficient to warrant an interlocutory injunction. 1 High on Injunctions, Sec. 22.

" An interlocutory injunction is merely a mode by which the court preserves the property in dispute, with the least injury to all parties, until it can finally determine their respective rights." 2 Daniell's Ch. Pl. & Pr. 1664.

350    APPELLATE COURTS OF ILLINOIS.

VOL. 77.] Chicago Exhibition Co. v. Ill. State Bd. of Agriculture.

The same author says : " When the rights of the parties are doubtful the court will, on an application for an inter-locutory injunction, consider the comparative injury which will result from granting or withholding the injunction. as well as the justice of the case as it appears on the evidence." Ib. 1664.

On the subject of notice Daniell says : " When the mere act of giving notice might be, of itself, productive of the mischief apprehended, by inducing him to accelerate the act in order that it might be complete before the time for making the application should have arrived, the court will award the injunction without notice, or even before service of a copy of the bill." Ib.

Appellant's counsel object that the affidavit is not a sufficient verification of the bill to warrant a preliminary injunction. The affidavit, in so far as the same is in support of the bill, omitting the venue, is as follows :

" Benjamin H. Brainard, being first duly sworn, upon his oath deposes and says that he is the treasurer of the said State Board of Agriculture, complainant in the foregoing bill of complaint, and that he has read the foregoing bill of complaint of the State Board of Agriculture, and knows the contents thereof; that the said bill, and the matters and things therein stated, is and are true of affiant's own knowledge, except those allegations in said bill of complaint made upon information and belief, and as to all such matters charged or made upon information and belief in said bill, he believes that such matters, as the same are alleged in said bill, to be true, and that the said bill, and each and every allegation thereof, is true."

Affidavits substantially the same in form have been repeatedly held insufficient by this court. Deimel v. Brown, 35 Ill. App. 303; Siegmund v. Ascher, 37 Ib. 122; Brabrook Tailoring Co. v. Belding Bros. & Co., 40 Ib. 326; Stirlen v. Neustadt, 50 Ib. 378; Werner Co. v. First Nat. Bk., etc., 55 Ib. 321; Earle v. Earle, 60 Ib. 360.

The reason for holding such affidavit insufficient is thus stated in Stirlen v. Neustadt, *supra:* " What matters

there may be in the bill that are stated on information and belief can only be known by probing the mind of the pleader; but matters that are stated to be on information and belief can be ascertained by reference to the bill."

We do not feel warranted in departing from the long line of decisions of the court holding such an affidavit as the one under consideration insufficient, and substantially establishing a rule of practice, and might have reversed the order on the ground of insufficient verification of the bill, omitting consideration of the merits of the controversy; but inasmuch as the questions presented here may again arise in the Circuit Court in the further progress of the cause, we have thought it expedient to consider the bill on its merits.   For the reason that the verification of the bill is insufficient, the order will be reversed.